# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LARRY TAYLOR** | **CIVIL ACTION** |
| **VERSUS** | **NO: 06-5318** |
| **DIAMOND OFFSHORE DRILLING, INC.** | **SECTION: "S" (1)** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. BACKGROUND

On June 18, 2006, Larry Taylor was employed by Diamond Offshore Management Company (Diamond) as a floor hand (roughneck) aboard the OCEAN DRAKE. One of his tasks that morning was to climb down to the rotary table to secure a wiper rubber to the diverter housing in order to prevent the wiper rubber from being pulled into the drilling hole. Taylor was pulling on a rope to tighten the knot when he felt a pop in his neck. Taylor reported that he was unable to continue working because of increasing pain and stiffness in his neck.

Taylor was evaluated on the rig by the safety representative, Stephen Hamilton, who determined that Taylor should be sent ashore for treatment. He was taken to Westbank Industrial Medicine where he was examined by Dr. Brian Bourgeois, who prescribed conservative treatment and sent him home to Hattiesburg, Mississippi.

In Hattiesburg, Taylor was under the care of Dr. Michael Molleston, a neurosurgeon. Dr. Molleston performed a surgical procedure at the C4-5 level on September 14, 2007. Dr. Molleston determined that Taylor has reached maximum medical improvement as of June 4, 2008, but opined that he is restricted to sedentary or light work in the future.

Diamond took the position that the surgery performed by Dr. Molleston was neither necessary nor reasonable under the circumstances. Diamond paid Taylor maintenance of $5,950 from June 18, 2006 through February 13, 2007 and medical expenses of $8,205.20 through January 23, 2007.

Taylor filed a complaint under Federal Rule of Civil Procedure 9(h) against Diamond Offshore Management Company and Diamond Offshore Services Company (Diamond), asserting claims of negligence under the Jones Act, 46 U.S.C. § 688, and unseaworthines and maintenance and cure under the general maritime law. A non-jury trial was held on October 30, 2008.

## II. DISCUSSION

### A. Negligence and unseaworthiness

Taylor alleges that Diamond was negligent in instructing him to lower himself through the rig floor into a cramped area to attach the rubber wiper. Taylor argues that there was no requirement to "tie off" the pipe wiper because it fits snugly around the drill pipe. Taylor contends that he was not given prior training for the task and that Diamond should have instructed him to use a safety lanyard or a Texas Deck[1] if he was required to descend beneath the

---

[1] A Texas deck is a deck that is maneuvered up and down to work on the stack.

rig floor. Taylor further argues that the dangerous conditions under which he performed the task rendered the vessel unseaworthy.

**1. Legal standard**

Jones Act negligence and unseaworthiness claims are separate causes of actions and are treated as such. See Brunner v. Maritime Overseas Corp., 779 F.2d 296, 298 (5th Cir. 1986). In this case, the basis of both the negligence and unseaworthiness claims is that Taylor was injured when he descended into the opening beneath the rig floor to secure a rubber wiper to the diverter housing under unsafe conditions which caused his injury.

Under the Jones Act, a seaman's employer is liable for damages if the employer's negligence caused the seaman's injury. See Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir. 1997) (en banc). The employer is held to a standard of ordinary prudence under the circumstances. Id. "A seaman is entitled to recovery under the Jones Act, therefore, if his employer's negligence is the cause, in whole or in part, of his injury." Id. The terms "slightest" and "featherweight" have been used to describe the reduced standard of causation between the employer's negligence and the employee's injury. Id. at 335; Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1352 (5th Cir. 1988).

A seaman is obligated under the Jones Act "to act with ordinary prudence under the circumstances" to protect himself from injury. Id. at 339. "The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. The reasonable person standard, therefore, [in] a Jones Act negligence action becomes one of the reasonable seaman in like circumstances."

3

Id.

"[L]iability based upon unseaworthiness is wholly distinct from liability based upon negligence." Usner v. Luckenbach Overseas Corp., 91 S.Ct. 514, 517 (1971). "Although the shipowner has an absolute duty to provide a seaworthy vessel, the vessel need not be 'accident free.'" Simeon v. T. Smith & Son, Inc., 852 F.2d 1421, 1432-33 (5th Cir. 1988). "For a vessel to be found unseaworthy, the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it is to be used." Jackson v. OMI Corp., 245 F.3d 525, 527 (5th Cir. 2001). "[A]n unsafe method of work may also render a vessel unseaworthy." Phillips v. Western Co. of North America, 953 F.2d 923, 928 (5th Cir. 1992). The duty to provide a seaworthy vessel is absolute and completely independent of the duty under the Jones Act to exercise reasonable care; therefore, a showing of negligence is not required. See Phillips v. Western Co. of North America, 953 F.2d 923, 928 (5th Cir. 1992).

**2. Evidence of the injury**

Taylor testified that he was in the first week of his fourth "hitch"[2] aboard the OCEAN DRAKE when the incident occurred. The crew was shorthanded because the derrickman was injured, and others had to cover his assignments. The driller, James Ramsey, decided that they would begin by putting the wiper rubber in the hole and tying the rope. The purpose of the wiper rubber was to keep any objects that fell from the rig floor out of the hole. Taylor and others set

---

[2] A hitch is a 14-day period. Taylor worked days from noon to midnight the first week, and nights from midnight to noon the second week.

the slips, broke the pipe joint at the middle, slid the wiper rubber over the top of the pipe, pushed the wiper rubber down until it sat on top of the slips, and connected the joint.

Taylor decided that he would climb into the opening to the rotary table, which was approximately three feet in diameter, and finish the job of securing the rope to the wiper rubber. He lowered himself down until his feet touched the top of the diverter. He had to be careful that his footing was solid because there was completion fluid[3] on the rim, which could have caused him to slip into the pollution pan. Although the opening resembled a tube, Taylor stated that he could not lean back against the steel wall or forward against the pipe because there was slippery, completion fluid on both. Taylor squatted in an awkward position and stretched to his left to secure the first rope. Taylor tried to keep his balance while threading the ropes through the pad eyes and looping them back to tie two or three knots on the oily ropes.

When Taylor was completing the task of tying the knots, Ramsey stood over the hole and asked if he was finished and if the knots were tight. Taylor pulled on the third knot and felt a "pop" in his neck. When he stood up, the pain was immediate and intense with a burning sensation. Taylor got back on the ledge and someone helped him to his feet. The pain was so intense that he "got lost in what all we were doing." Taylor attempted to roll and stretch his neck to see if the pain he was feeling was real. He stated that he tried not to panic and tried to join the rest of the crew in completing the work. As he reached down for the rope to tie the handles of the slips, he felt a sharp pain in his arm emanating from the shoulder.

---

[3] There is a question whether the substance in the pollution pan was zinc bromide or calcium chloride. Zinc bromide is in the same family as calcium chloride, which is a slippery, completion fluid that accumulated in the hole.

The Safety Department Representative, Stephen Hamilton, helped Taylor complete an accident report. Taylor could not return to work and stayed on the rig for two days resting with a heating pad, taking hot showers, and taking pain killers administered by the medic. Taylor left his hitch two days early to see a doctor at the Westbank Industrial Medicine facility. He was in severe pain, his muscles had tightened, and he could not turn his head.

### 3. Evidence regarding negligence or unseaworthiness

On June 30, 2006, Scott Vaughn, the manager of Diamond's claims department, visited Taylor at his home in Hattiesburg, Mississippi, to discuss the accident. Taylor stated that the crew had "a big thing about safety" and made "a great effort to try to make sure everybody stays safe." In the interview, Taylor attributed his injury to "an awkward angle or something that I was at," but not a lack of safety procedures. Taylor agreed that the "stop work authority cards" (the STOP Program) implemented by Diamond eliminates incidents and injuries by the elimination of unsafe acts and conditions. Taylor stated to Vaughn: "It's unbelievable as to how well that system does. It is one that keeps a continuous mindset on safety. And it allows everybody to develop work behaviors around safety." At trial, Taylor praised the program.

Although he had performed the procedure of tying the wiper rubber many times prior to his injury, Taylor had never suggested that the procedure was unsafe or that Diamond should use an alternative method. Taylor learned to do the job by watching someone else a few times. Taylor stated that, on the day of the accident, there were procedures that were new to him, but he was briefed; and everything was going well. Taylor was wearing all of the protective equipment that was required: a hard hat, gloves, and work boots.

Taylor was not aware of any written "Job Safety Analysis" (JSA)[4] for performing the job. Hamilton testified that he was not aware of a JSA for the task of putting on the wipe rubber because it was a routine task, and no such analysis has been created since Taylor's injury. Hamilton testified that a JSA is applied to safety critical jobs, tasks, and procedures and to new procedures. The Diamond Safety Manual defines a safety-critical task as "any job or procedure that may lead to hazards or risks." Hamilton stated that putting the wiper rubber on was not a safety-critical task.

Taylor testified that the condition was unsafe because, if he had fallen forward, he could have slipped into the hole. He acknowledged, however, that the opening was 9.65 inches with a 3.5 inch casing inside. Further, Taylor was concerned that he could be burned by the completion fluid if he had fallen into the pollution pan.

Milton Trass, a motorman with thirteen years of experience with Diamond, testified that, when Taylor reported for work at midnight, he noticed that Taylor had his neck "crooked" to one side. Trass had performed the task of tying the wiper rubber many times when he worked as a floorhand, and he was not aware of anyone else being injured tying a wiper rubber. Trass testified that there is nothing unsafe about it: "There's only one way. You've got your rope. You tie it in a knot. That's it."

Ramsey testified that he was in the driller's shack at the time of the incident. He stated that Taylor had installed the wiper rubber many times without problems or complications, and he

---

[4] Hamilton testified that a "JSA is a step-by-step procedure in how jobs are done listing potential hazards and ways of mitigating those hazards."

7

was not aware of anyone who had been injured performing the task. Ramsey stated that a Texas deck could not have been used to install the wiper rubber because the rig was located over a production platform. Ramsey did not believe that a safety lanyard was required for tying a wiper rubber. Ramsey also stated that lighting was not a problem because there are lights throughout the derrick.

Charles Goodson, a shakerhand employed by Diamond, was Taylor's roommate aboard the OCEAN DRAKE. He testified that he and a few other roughnecks were standing over the hole when Taylor went in to install the wiper rubber. Goodson has installed the wiper rubber "numerous" times without problem or injury. Goodson stated that he has always considered the lighting in the hole to be sufficient to tie the wiper rubber, and Taylor did not request that anyone hold a flashlight for him.

Calvin Barnhill, a registered professional petroleum engineer, testified that the use of a wiper rubber to cover the hole is common in the industry. The purpose of tying the wiper rubber is to prevent it from inadvertently being stuffed down the hole when larger tool joints pass through. Barnhill stated that he had tied wiper rubbers himself as long ago as 1969 and that there was nothing out of the ordinary about the task Taylor performed. Barnhill had never seen a JSA for the procedure of tying a wiper rubber. He testified that there was no evidence that any equipment failed, that the crew was not properly trained, or that any government regulations were violated.

Barnhill identified the completion fluid in the pollution pan as zinc bromide. He stated that anyone working around the fluid should wear the normal protective clothing that would be

8

used on the drill floor, such as a slicker suit, long sleeve shirt, steel-toed rubber boots, and gloves. Barnhill opined that a lanyard was not necessary because there was no potential of falling a significant distance because of the configuration of the system.

### 4. Conclusion

The court finds credible Taylor's testimony that he sustained an injury while pulling on the ropes to secure the wiper rubbers to the diverter housing. By all accounts, Taylor was an experienced, intelligent, conscientious worker, who valued his position aboard the OCEAN DRAKE**.** Although he awoke with a stiff neck, he reported to work, climbed into the opening to the rotary table, and carefully went about the task of securing the rope. When Taylor felt the "pop" in his neck, he felt intense pain and a burning sensation, which precluding him from continuing his work. Taylor reported his pain, which worsened as his muscles tightened, and left his hitch two days early to obtain medical treatment.

The evidence does not support a finding that Diamond's negligence or the unseaworthiness of the vessel caused the injury. The procedure of tying the wiper rubber was well-established, having been performed by Taylor and others many times over the years. Credible testimony supports a finding that Taylor performed a routine task that did not require a written JSA because it was not "safety-critical." Prior to his injury, Taylor had never suggested that the procedure was unsafe or that it should be performed by an alternative method. Taylor stated that safety was paramount at all times, and that the safety system instituted by Diamond worked well.

The court finds not credible Taylor's theory that the task required a lanyard or a Texas

deck to protect him from falling in the pollution pan. There was credible testimony that neither a Texas deck or a lanyard was appropriate to perform the task. Moreover, Taylor was able to maintain his balance, he wore adequate protective clothing, and his injury occurred when he exerted the effort of pulling on the rope to tighten the knot from an awkward position. Taylor has not shown that Diamond did not exercise ordinary prudence, and that Diamond caused his injury in whole or in part; therefore, he has not proved his claim of negligence.

Taylor does not present evidence of defective equipment or other condition that would render the OCEAN DRAKE unseaworthy. The United States Coast Guard has inspected the OCEAN DRAKE and certified that it is fit for duty. Accordingly, the court finds that Taylor has not shown that Diamond provided a working condition or a method of work that was not reasonably fit and safe and that rendered the OCEAN DRAKE unseaworthy.

## B. Maintenance and cure

Although the circumstances of this case do not support a claim for negligence or unseaworthiness, Taylor was injured in his service to the OCEAN DRAKE and is entitled to maintenance and cure. Taylor contends that Diamond denied adequate maintenance and cure benefits. Diamond contends that Taylor reached maximum medical improvement as of December 21, 2006, the date he was evaluated by Dr. Steck, and that Diamond has paid all maintenance and cure which is due. Diamond contends that the cervical procedure performed by Dr. Molleston was unnecessary and unwarranted and that the medical costs associated with that surgery are unreasonable.

### 1. Legal standard

"Maintenance and cure is an ancient duty imposed upon a shipowner to provide for a seaman who becomes ill or injured during is service to the ship." Silmon v. Can Do. II, Inc., 89 F.3d 240, 242 (5th Cir. 1996). The duty is implied in maritime employment contracts and is not premised on the fault or negligence of the shipowner. Id. "The right terminates only when maximum cure has been obtained." Bertram v. Freeport McMoran, Inc., 35 F.3d 1008, 1012 (5th Cir. 1994) (internal quotation and citation omitted). "Maximum cure is achieved when it is probable that further treatment will result in no betterment of the seaman's condition." Springborn v. American Commercial Barge Lines, Inc., 767 F.2d 89, 95 (5th Cir. 1985). It is proper to declare maximum cure if the condition is incurable or if further treatment will only relieve pain and suffering. See Pelotto v. L & N Towing Co., 604 F.2d 396, 404 (5th Cir. 1979).

**2. Treatment for the injury**

Taylor was treated on June 19, 2006, at Westbank Industrial Medicine by Dr. Brian Bourgeois and diagnosed with a cervical strain. He underwent a MRI on June 21, 2006, and the result was overall "unremarkable." Dr. Bourgeois prescribed pain killers and physical therapy. Taylor was released to light duty work on July 20, 2006, and instructed to return to Westbank Industrial Medicine on August 4, 2006.

Taylor was dissatisfied with the medical treatment because he continued to have pain. He contacted an attorney, who recommended several physicians. On August 24, 2006, Taylor was examined by Dr. Michael Molleston, a neurosurgeon. Dr. Molleston was concerned that Taylor had suffered a ruptured disc in his neck and ordered a repeat MRI scan and X-rays of the cervical spine. The results of the MRI and X-rays on September 28, 2006, were normal. On

October 3, 2006, Dr. Molleston noted that, although the radiologist described the MRI scan as "normal," there appeared to be some disc bulging at C6-7. It was difficult to tell if "it is a spondylosis type situation that has been aggravated by his accident or whether or not it represents a small disc rupture." Dr. Molleston recommended chiropractic care and two epidural steroid injections. Dr. Molleston did not permit Taylor to work until further notice.

On December 13, 2006, Taylor saw Dr. Molleston again, complaining of persistent, severe neck stiffness and severe paraspinous muscle spasms and pain over the vertebra prominens and toward the base of the skull. Dr. Molleston found that his right arm was weak, and his reflexes were abnormal with a decreased right biceps jerk and hyperactive lower extremity reflexes. Taylor's pain was significant, and the epidural steroid injections provided relief for only two days. Dr. Molleston ordered a cervical discogram to detect an injury that the MRI scan may have missed.

Diamond requested that Dr. John Steck, a neurosurgeon with the Culicchia Neurological Clinic, evaluate Taylor. On December 21, 2006, Dr. Steck examined Taylor for approximately 30 minutes and reviewed the medical records from Dr. Bourgeois. The physical examination revealed a "give way" weakness in the right biceps, which Dr. Steck attributed to pain, and decreased sensation in the hands. Taylor's complaints did not fit a pattern neurologic injury and were considered normal. Initially, Dr. Steck was not able to form an opinion on the recommendation for a discogram because he had not seen the repeat MRI. On March 1, 2007, Dr. Steck reviewed the September 28, 2006, MRI and determined that Taylor was neurologically intact. He did not recommend a discogram. Dr. Steck testified that he would not have operated

on Taylor based on the data before him.

On April 18, 2007, Dr. Molleston reported that the discography eliminated C6-7 as the pain generator. Dr. Molleston was concerned that C5-6 and C4-5 may be involved and ordered a repeat discogram. On May 16, 2007, Dr. Molleston referred Taylor to Dr. David McKellar for a discogram at C3-4, 4-5, and 5-6. At C4-5, Dr. McKellar reported "possible posterior spread of contrast beyond the limits of the intervertebral disk" and referred to "post-diskogram CT scanning for correlation." On May 23, 2007, Dr. Molleston reviewed the post-diskogram CT scan and confirmed an abnormality at C4-5, with concordant pain and leakage of the dye into the right side of the spinal canal. Dr. Molleston recommended anterior cervical discectomy and fusion at C4-5. On September 14, 2007, Dr. Molleston performed an anterior cervical discectomy with interbody fusion with instrumentation and anterior cervical plating with harvest of local bone.

On February 13, 2008, Dr. Steck opined that Taylor was not a candidate for discectomy and should have been managed nonoperatively. On April 14, 2008, Dr. Steck reviewed all medical records and concluded that Taylor should not be restricted from working in any capacity that he felt comfortable.

On June 4, 2008, Dr. Molleston re-examined Taylor and found some improvement. Taylor was working 20 hours a week at a sedentary job as a security guard. Taylor still had stiffness and pain in his neck, which affected his ability to sleep. He experienced numbness in his arms and pain in his neck if he tried to perform overhead work or sustained lifting. His reflexes were hypoactive, he had severe palpable spasm in the cervical spine, the cervical range

13

of motion was impaired by over 50 percent, and he had greater difficulty with cervical extension.

On September 2, 2008, Dr. Molleston completed a functional limitations form, indicating that Taylor could perform full-time, modified light work. Taylor was restricted to lifting frequently 0 to 10 pounds without reaching above his shoulders, occasionally lifting 11 to 20 pounds, standing no more than 15 minutes without rest, sitting no more than two hours without rest, and walking no more than 15 minutes without rest.

On October 7, 2008, Dr. Molleston conducted a follow-up examination. Taylor was working part-time as a security guard, watching monitors and assisting around the lobby. Cervical spasms were present, reflex was hyperactive in the left biceps and normoactive in the right biceps, he had good strength, and cervical range of motion was impaired by 50%.

The court credits the testimony of the treating neurosurgeon, Dr. Molleston, that the surgery he performed was necessary and reasonable. Taylor experienced debilitating pain, and conservative treatment did not alleviate the pain. Over a period of more than one year, Dr. Molleston incrementally eliminated perceived causes of Taylor's condition until he confirmed an abnormality at C4-5. On cross-examination, Dr. Steck agreed that it was possible that Dr. Molleston was able to visually confirm the condition of the C4-5 disc during the surgery.

### 3. Calculation of maintenance and cure

#### a. Maintenance

Taylor's treating physician determined that Taylor reached maximum medical improvement on June 4, 2008. Diamond made payments for maintenance through February 13, 2007. Therefore, Diamond owes Taylor maintenance in the stipulated amount of $25 per day

from February 14, 2007 through June 4, 2008.

**b. Cure**

Taylor presents evidence of medical expenses related to treatment, diagnosis, and surgery for his injury after January 23, 2007,[5] and seeks payment for the entire amount of his medical bills. See Exhibits 14-20. Diamond contends that Taylor's medical expenses are excessive and should be reduced.

"The cause of action for maintenance and cure is intended to afford a seaman a simple remedy for losses resulting from employment-related injuries;" therefore, "this remedy has always been liberally construed in favor of the seaman." Caulfield v. AC&D Marine, Inc., 633 F.2d 1129, 1135 (5th Cir. 1981). The burden is on the employer to establish that the doctor chosen by the employee provided unnecessary treatment or that the fees were unwarranted. Id. To support its burden, Diamond puts forth the deposition testimony of Harvey Cooper. Because Diamond has this burden, Taylor's motion *in limine* to strike Cooper's deposition testimony is denied.

Cooper is the owner of American Medical Auditors, a company that reviews hospital bills, doctor bills, and other related medical bills for insurance companies, attorneys, self-insured companies, and insurance adjusters. He testified by deposition as an expert auditor regarding an audit, requested by Diamond, of the reasonableness of the medical bills related to Taylor's surgery. Assessing Dr. Molleston's invoice, Cooper stated that Dr. Molleston performed a

---

[5] The parties stipulate that Diamond paid medical bills and cure through January 23, 2007 in the amount of $8,205.20.

multiple procedure, did not use the CPT code modifier for a multiple procedure, and billed at "full charge" for each procedure as if each was a separate procedure. Based on his experience, he stated that it is a usual and customary billing practice that the doctor bill at "half charge" for subsequent procedures at the same site. Further, Cooper testified that Dr. Molleston "up-coded" a follow-up office visit by charging for CPT code 99215, which would be appropriate in a life-threatening visit or an initial visit at the beginning of treatment when the physician spends more time with the patient. Cooper opined that Dr. Molleston's bill should have been $4,720.76.

Cooper also testified concerning Wesley Medical Center's bill and Hattiesburg Anesthesia's bill. He concluded that, based on the federal guidelines[6] accepted throughout the country, the hospital bill should have been reduced to $14,293.63. Because the anesthesia bill was not presented on the HCL 1500 form, Cooper had to estimate the amount of time that the anesthesiologist was present. He concluded that the total reasonable charges for the anesthesia bill was $1,134.[7]

Cooper testified that he was not asked to contact Dr. Molleston, the hospital, or the anesthesiologist prior to the surgery to negotiate a reduction in the charges; however, Cooper had reached an agreement with the hospital in other cases to charge consistently with the federal

---

[6] Cooper opined that the OWCP Federal Workers Compensation guidelines apply in maritime cases under federal jurisdiction. The OWCP rates are 125% of Medicare. If a doctor or a hospital signs a waiver of deficiency, the guidelines are accepted as a reasonable charge, and the balance is written off. In this case, there is no waiver, and the medical care providers have letters of protection from the plaintiff's attorney.

[7] Cooper addressed only the invoices from the hospital, the anesthesiologist, and the surgeon.

16

guidelines.

Diamond has not carried its burden of proving that the "retail" medical bills are unreasonable or that the health care providers in this case would accept a negotiated, reduced payment. Because of Diamond's objection to the surgery, it made no attempt to negotiate with the health care providers, and any estimate of what amount in payment they would be willing to accept is speculative. Thus, in the context of cure, recovery is not limited to the amount that might have been accepted, and Taylor is entitled to the full "retail" cost of the medical services for which he has presented invoices in exhibits 14-20.

### c. Penalties and attorney's fees for failure to pay maintenance and cure

The evidence does not support a finding that Diamond unreasonably rejected Taylor's claim for maintenance and Cure. Diamond relied in good faith on Dr. Steck's opinion that Taylor had reached maximum medical improvement and did not require surgery. Taylor has not shown that Diamond's handling of the claim was unreasonable under the circumstances, and penalties and attorney's fees are not warranted.

### III. CONCLUSION

The court finds that Taylor was injured in performing service aboard the OCEAN DRAKE when he attempted to secure a wiper rubber. However, Diamond was not negligent and did not cause Taylor's accident and injury, and the vessel was not unseaworthy. As a seaman, Taylor is entitled to maintenance and cure, regardless of the lack of fault or negligence of Diamond, from the time of his injury until he attained maximum medical improvement, which

17

this court determines occurred on June 4, 2008. Diamond shall receive a credit for any amount that has already been paid to Taylor. The court also finds that Diamond did not unreasonably withhold payment of maintenance and cure from Taylor.

New Orleans, Louisiana, this 7th day of April, 2009.

**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**